# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DANA DESJARDINS,          )
                                    )
          Plaintiff,       )
                                    )
v.                             )     Civil No. 2:13-cv-00338-NT
                                    )
DONALD WILLARD and     )
MICHAEL REYNOLDS,       )
                                    )
          Defendants.    )

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

The complaint brought by Plaintiff Dana Desjardins asserts claims against Defendant Donald Willard, Raymond's Town Manager, and Defendant Michael Reynolds, a Raymond Selectman, under both federal and Maine law. Pl.'s Compl. 3-21 (ECF Nos. 1-1, 1-2) (the "**Complaint**"). The Complaint claims that the Defendants falsely reported to the Cumberland County Sheriff's Department (the "**Sheriff's Department**") that Desjardins drives while intoxicated and shows up to public meetings drunk. Desjardins alleges that these statements damaged his reputation and led the Sheriff's Department to red-flag Desjardins and pull him over without cause. The Complaint asserts that Willard and Reynolds may be held liable under state tort law and 42 U.S.C. § 1983 and brings several subsidiary requests for relief. Before the Court are four motions: (1) Defendant Reynolds's motion to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 8) ("**Reynolds's Rule 12(b)(6) Motion**"); (2) Defendant Willard's Rule 12(b)(6) motion (ECF No. 7) ("**Willard's Rule 12(b)(6) Motion**"); (3) Defendant

Reynolds's special motion to dismiss the Plaintiff's complaint under Maine's anti-SLAPP[1] statute, 14 M.R.S. § 556 (ECF No. 11) ("**Reynolds's Special Motion**"); and (4) Defendant Willard's special anti-SLAPP motion (ECF No. 12) ("**Willard's Special Motion**").

For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Reynolds's Rule 12(b)(6) Motion, **GRANTS** Willard's Rule 12(b)(6) Motion, and **GRANTS IN PART** Reynolds's Special Motion. This disposition effects the dismissal of all the claims against the Defendants, so the Court also **DENIES AS MOOT** the remainder of Reynolds's Special Motion and the entirety of Willard's Special Motion.

## PROCEDURAL HISTORY

In August of 2013, the Plaintiff filed an eight-count complaint in Cumberland County Superior Court. In Counts I through IV, the Complaint alleges that the Defendants are liable under Maine law for defamation, negligent infliction of emotional distress, intentional infliction of emotional distress, and false light. In Count V, the Plaintiff seeks injunctive relief. In Count VI, the Plaintiff alleges that the Defendants are liable under 42 U.S.C. § 1983 for violating the Fourth Amendment's prohibition on unreasonable seizures and for violating a liberty interest protected by the Fourteenth Amendment's Due Process Clause. In Count VII, the

---

[1] "SLAPP" is an acronym which stands for "Strategic Lawsuit Against Public Participation." *Nader v. Me. Democratic Party*, 66 A.3d 571, 575 n.8 (Me. 2013) ("***Nader II***").

Plaintiff seeks attorney's fees under 42 U.S.C. § 1988. In Count VIII, the Plaintiff seeks punitive damages.[2]

In September of 2013, the Defendants removed the action to this District and filed motions to dismiss all of the Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). In October of 2013, the Plaintiff conceded that his negligent infliction of emotional distress and intentional infliction of emotional distress claims should be dismissed under Rule 12(b)(6).[3] Pl.'s Opp'n to Def. Reynolds's 12(b)(6) Mot. 19 (ECF No. 9). Thereafter, the Defendants filed special motions to dismiss all of the Plaintiff's claims under Maine's anti-SLAPP statute, 14 M.R.S. § 556, along with supporting affidavits and evidentiary exhibits. The Plaintiff opposed the Defendants' special motions and filed his own supporting affidavits and evidentiary exhibits.

## THE RULE 12(b)(6) MOTIONS

In order to avoid unnecessarily applying Maine's anti-SLAPP statute, the interpretation of which remains a developing area of state law, the Court first analyzes the Defendants' regular motions to dismiss and proceeds to the Defendants' special motions to dismiss only with respect to the claims that survive.

---

[2] Counts V, VII, and VIII are subsidiary requests for relief, not freestanding claims, and can be granted only if the substantive claims to which they are attached are successful. *Largess v. Supreme Judicial Court of Mass.*, 373 F.3d 219, 223 n.2 (1st Cir. 2004) (injunctive relief available only if plaintiff succeeds on § 1983 claims); *Natale v. Kennebunkport Bd. of Zoning* Appeals, 363 A.2d 1372, 1377 n.9 (Me. 1976) (injunctive relief available only if plaintiff succeeds on Maine tort law claims); 42 U.S.C. § 1988 (attorney's fees available only if plaintiff succeeds on § 1983 claim); *Powell v. Alexander*, 391 F.3d 1, 18 (1st Cir. 2004) (punitive damages available only if plaintiff succeeds on § 1983 claim); *DiPietro v. Boynton*, 628 A.2d 1019, 1025 (Me. 1993) (punitive damages available only if plaintiff succeeds on Maine tort law claims).

[3] Based on this concession, the Court grants Reynolds's Rule 12(b)(6) Motion and Willards's Rule 12(b)(6) Motion as to Counts II and III.

## I.	Legal Standards

### A.	The Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint on the grounds that the plaintiff failed "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is warranted only if a complaint fails to meet the limited notice pleading requirement imposed by Rule 8(a)(2) of the Federal Rules of Civil Procedure. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011).

Rule 8(a)(2) requires a civil complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A 'short and plain' statement needs only enough detail to provide a defendant with 'fair notice of what . . . the claim is and the grounds upon which it rests.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (citations and quotation marks internal to *Twombly* omitted).

A court reviewing a motion to dismiss must accept the factual allegations in the complaint as true and draw all plausible inferences in the plaintiff's favor. *Gonzalez Figueora v. J.C. Penney P.R., Inc.*, 568 F.3d 313, 316 (1st Cir. 2009). However, a complaint cannot rest on a legal conclusion or generic "the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). It "must contain enough factual material 'to raise a right to relief above the speculative level . . . .'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Twombly*, 550 U.S. at 555).

**B.** *Watterson v. Page* **Exception**

Generally, the court deciding a Rule 12(b)(6) motion may consider only the complaint and any exhibits incorporated into it by the plaintiff. *Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013). However, in *Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993), the First Circuit articulated a "narrow exception" to the general rule, under which courts considering a motion to dismiss may also consider documents that fit into any of the following categories: (1) "documents the authenticity of which are not disputed by the parties"; (2) "official public records," *Watterson*, 987 F.2d at 3; and (3) "document[s] integral to or explicitly relied upon in the complaint." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (cited by *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315 (1st Cir. 2008)); *see also Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."). Accordingly, in *Fudge v. Penthouse International, Ltd.*, 840 F.2d 1012 (1st Cir. 1988), the First Circuit concluded that a district court reviewing a motion to dismiss properly considered a copy of an allegedly libelous article appended to a motion to dismiss. *Fudge*, 840 F.2d at 1014-15. Likewise, in *Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007), a First Amendment retaliation case, the First Circuit concluded that a district court granting a Rule 12(c) motion for judgment on the pleadings properly considered a number of threatening statements the plaintiff posted to a message board which he described in his complaint but did

not attach or incorporate. *Id.* at 41, 44 & n.5 (noting that Rule 12(c) standard is similar to Rule 12(b)(6) standard and applying *Watterson v. Page* exception).

In this case, the Complaint refers to a "series of emails" between the Defendants and the Sheriff's Department, which the Sheriff's Department turned over to the Plaintiff in response to a Freedom of Access request. Compl. ¶ 15. While the Complaint quotes and characterizes the emails liberally, the Plaintiff did not incorporate or attach them. However, the Defendants attached copies of the emails to their Rule 12(b)(6) motions, along with an affidavit attesting that they are the same series of emails the Sheriff's Department produced in response to the Plaintiff's Freedom of Access request. Attach. 2 to Reynolds's Rule 12(b)(6) Mot. (ECF No. 8-2) ("**Sheriff's Dept. Emails**") (also found at ECF Nos. 7-2, 11-3, 11-8, 12-2, & 12-9); Sept. 9, 2013 Aff. of Peter Nichols (ECF Nos. 7-1, 8-1). The Defendants ask the Court to consider the emails when deciding their Rule 12(b)(6) motions. Reynolds's Rule 12(b)(6) Mot. 9 n.4, Willard's Rule 12(b)(6) Mot. 8 n.5.

Application of the *Watterson v. Page* exception allows the Court to do so. First, the Plaintiff does not dispute the authenticity of the emails, either individually or as a whole. Second, to the extent the Plaintiff contends the emails are defamatory, the Court is in a position indistinguishable from that in *Fudge v. Penthouse* and *Curran v. Cousins*. Third, the Complaint expressly relies on the entire "series of emails" produced by the Sheriff's Department for critical factual allegations and inferences. *See* Compl. ¶ 15. Thus, the complaint's factual allegations are "expressly linked to" and "admittedly dependent upon" the emails. *Beddall*, 137 F.3d at 17.

## II.    Factual Background

The factual recitation below is constructed from the allegations in the Complaint and the emails with all plausible inferences drawn in the Plaintiff's favor, except that the Court draws on the actual emails[4] described above rather than rely solely on the Complaint's characterizations of them.

Dana Desjardins, the Plaintiff, is a long-time resident of the town of Raymond, Maine. Compl. ¶ 2. From the early 2000s through October of 2010, he served as a member of the town's selectboard. Compl. ¶ 2. He currently sits on the town's budget committee. Compl. ¶ 2.

Desjardins's rift with the Defendants, Raymond Town Manager Don Willard and Raymond Selectman Michael Reynolds, began when Desjardins was still a selectman. Compl. ¶ 16. In July of 2009, Desjardins suggested that the town terminate Willard's position as town manager. Compl. ¶ 16. Desjardins also raised questions about a land deal between the town and Reynolds. Compl. ¶ 17.

The events that led to this lawsuit began in early October of 2012. At that time, a detective at the Sheriff's Department advised Desjardins that the department had received email reports[5] that he had been seen "drinking and driving around Raymond on a regular basis." Compl. ¶ 5. The detective told Desjardins that as a result of the

---

[4]    Where the Court quotes from the emails, typos and non-standard uses found in the original text are preserved except where noted with brackets.

[5]    Though the Plaintiff's Freedom of Access request did not include emails prior to December of 2012, the Complaint alleges that Reynolds and Willard were sources of these reports. Compl. ¶¶ 15, 28; Sheriff's Dep't Emails. The Complaint also alleges that additional emails were requested from the town of Raymond in a Freedom of Access request, but that Reynolds and three other selectmen refused to respond to the request. Compl. ¶ 28.

accusations, the Sheriff's Department had "red-flagged" him. Compl. ¶ 5. According to the Complaint, two officers have to be called to the scene of any incident involving a "red-flagged" individual. Compl. ¶ 6.

On Friday, December 14, 2012, Reynolds wrote the following email to Cumberland County Sheriff Kevin Joyce:

> Dear Sheriff Joyce,
>
> I would like to talk to you or a member of your management team about a possible public safety issue at or after the Raymond Selectboard meeting scheduled for January 8, 2013. There is no hurry but I did want to send this along before it slipped my mind during the holidays and then have to scramble as the meeting approached. I can be reached at home [home number] or on my cell [cell number].
>
> Thanks for your consideration,
> Michael Reynolds
> Raymond Selectboard Member

Sheriff's Dep't Emails 3; Compl. ¶¶ 18-19.

The sheriff offered to call back over the weekend or on Monday. Sheriff's Dep't Emails 3; *see also* Compl. ¶ 18. "The topic doesn't involve Dana Desjardins by chance does it??" he also asked. Sheriff's Dep't Emails 3; *see also* Compl. ¶ 18. Reynolds responded, "Your detective skills are right on. Talk to you next week." Compl. ¶ 19; Sheriff's Dep't Emails 3.

Reynolds spoke to Sheriff Joyce by phone at some point in the following week and told him that Desjardins had attended several town meetings drunk. Compl. ¶ 20; *see also* Sheriff's Dep't Emails 4, 11. On December 21, 2012, Sheriff Joyce

emailed one of his officers, Deputy Don Goulet,[6] to tell him that he had received "anonymous complaints" about Dana Desjardins driving drunk and continually showing up at selectboard meetings inebriated and smelling of alcohol. Compl. ¶¶ 20-21; Sheriff's Dep't Emails 4. The sheriff asked Deputy Goulet to assign an officer to look out for the same kind of behavior at the upcoming selectboard meeting. Compl. ¶ 21; Sheriff's Dep't Emails 4. Sheriff Joyce wrote Deputy Goulet again around noon on January 5, 2013 to remind him to have someone monitor the roads on the evening of selectboard meeting to check for erratic driving by Desjardins. Compl. ¶ 22; Sheriff's Dep't Emails 5.

Sheriff Joyce also forwarded Willard copies of both the emails he had written to Deputy Goulet. Sheriff's Dep't Emails 7; *see also* Compl. ¶¶ 22-24. Willard responded at about 4:30 p.m. on January 5, 2013 with the following message:

> Thank you Kevin, there will be town staff in attendance to call in any observed behaviors or other signs that would indicate impairment.
>
> Have a good weekend.
>
> Don Willard
> Town Manager

Sheriff's Dep't Emails 7; *see also* Compl. ¶ 24.

Two days later, on the morning of January 7, 2013, Reynolds emailed Sheriff Joyce to remind him about the upcoming meeting:

> Hi Sheriff Joyce,

---

[6]     The Complaint refers to Don Goulet as Deputy Goulet, see Compl. ¶ 21, while an email written by Sheriff Joyce refers to Don Goulet as Captain Goulet. See Sheriff's Dep't. Emails 9. The Court adopts the Complaint's nomenclature.

Thanks again for your time on the phone before the holidays. Wanted to send alon[g] this note to let you know our next board meeting is tomorrow, Tue the 8th at 7pm. If there is a deputy available to stop by that would be great. I will also have the non-emergency dispatch # ready to call if I have solid information of a public safety issue.

Thanks

Mike Reynolds

Sheriff's Dep't Emails 11; *see also* Compl. ¶ 25.

Sheriff Joyce responded at around noon. Compl. ¶ 25; Sheriff's Dep't Emails 9. The sheriff forwarded Reynolds a copy of his January 5 email to Deputy Goulet and added the following message:

Captain Goulet is working on having a deputy assigned to the area during the meeting. I figured that on the first attempt, it would be beneficial to have a deputy out on the roadway checking for erratic operation of a motor vehicle rather than stopping into the meeting. Desjardins could be at the meeting intoxicated (not illegal unless he is creating a disturbance), therefore approaching him at the meeting would not be the best approach, initially.

As always, a phone call to dispatch advising that Dana appears to be intoxicated and leaving the meeting would help in giving us articulable suspicion to make a traffic stop and check on his well being.

Kevin

Sheriff's Dep't Emails 9; *see also* Compl. ¶ 26.

The afternoon of January 8, 2013, the day of the selectboard meeting, Desjardins saw a Sheriff's deputy in a marked SUV pull into his driveway. Compl. ¶ 7. The deputy soon turned around and left. Compl. ¶ 7. At around 6:50 p.m., Desjardins left his house to drive to the meeting. Compl. ¶¶ 7-8. After turning onto Route 85, Desjardins saw the same SUV on the side of the road. Compl. ¶ 8. The deputy pulled out as soon as Desjardins passed, followed him for about a half mile,

and then pulled him over. Compl. ¶ 8. The deputy told Desjardins that he was driving five miles an hour over the speed limit, which Desjardins disputes. Compl. ¶ 9. Desjardins told the deputy that he knew he had been "red-flagged" and asked who was making complaints about him. Compl. ¶ 11. The deputy acknowledged that the Sheriff's Department had received emails alleging that Desjardins drove to selectboard meetings drunk. Compl. ¶¶ 11, 13. The deputy issued Desjardins a verbal warning for speeding and then allowed him to leave. Compl. ¶ 11.

The following day, Reynolds wrote Sheriff Joyce to tell him that he had attended two public meetings earlier in the week and that Desjardins had attend both and appeared to be sober. Sheriff's Dep't Emails 10; *see also* Compl. ¶ 30. He suggested that Desjardins had changed his behavior because a Sheriff's Department officer tipped him off about Reynolds's prior complaints. Sheriff's Dep't Emails 10; *see also* Compl. ¶ 30. Reynolds added:

> If this is the reason that after months of showing up at town meetings possibly intoxicated that [Desjardins] showed up to two in a row without being an obvious public safety concern then I hope the rumor is true. We will see what happens in the future.

Sheriff's Dep't Emails 10; *see also* Compl. ¶ 30.

Desjardins claims he has never been intoxicated at a Raymond selectboard meeting and that he seldom drinks. Compl. ¶ 12.

## III. Reynolds's 12(b)(6) Motion

### A. Count I: Defamation

The Plaintiff claims Reynolds is liable under Maine law for defamation because of his communications with the Sheriff's Department. Reynolds argues that dismissal

is warranted under Rule 12(b)(6) because the claim is barred by the notice provision of the Maine Tort Claims Act (the **"MTCA"**) and the Plaintiff has failed to plausibly allege sufficient facts to support the elements of a defamation claim.

### 1.    MTCA Notice Provision

The Complaint does not allege that Desjardins provided notice of his claim to the town of Raymond within 180 days of when his cause of action accrued, as is generally required under the MTCA to bring a tort claim against a "governmental employee." 14 M.R.S. §§ 8102, 8107; *Cushman v. Tilton*, 652 A.2d 650, 651 (Me. 1995). However, because the Complaint alleges that Reynolds was acting outside the scope of his role as a Raymond selectboard member when he communicated with the Sheriff's Department about Desjardins, Compl. ¶ 31, and because factual development is required to resolve the issue, the MTCA's notice requirement does not now justify dismissal. *See Cushman*, 652 A.2d at 651-52; *Warren v. Nolan*, 536 A.2d 1134, 1136 (Me. 1988).

### 2.    Elements of a Defamation Claim

The elements of a defamation cause of action under Maine law are: (1) a false and defamatory statement pertaining to the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) per se damages or special harm. *Morgan v. Kooistra*, 941 A.2d 447, 455 (Me. 2008); *Garrett v. Tandy Corp.*, 295 F.3d 94, 103 (1st Cir. 2002); Restatement (Second) of Torts § 558 (1977).

### a.     A False and Defamatory Statement Pertaining to the Plaintiff

A statement is defamatory only if: (a) "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," *Schoff v. York Cnty.*, 761 A.2d 869, 871 n.3 (Me. 2000) (quoting Restatement (Second) of Torts § 558 (1977)) (internal quotation marks omitted); and (b) it is "an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). Whether a statement is capable of conveying a defamatory message is a question of law. *Morgan*, 941 A.2d at 455.

Here, the Complaint alleges that Reynolds repeatedly made false allegations to the Sheriff's Department that Desjardins drinks and drives and comes to public meetings inebriated. Taken as true, these allegations satisfy defamation's first element, requiring that the defendant's statement be false and defamatory.

### b.     An Unprivileged Publication to a Third Party

"Publication" is a term of art which refers to "any communication by the defendant to a third person." *Cole v. Chandler*, 752 A.2d 1189, 1197 (Me. 2000)) (quoting Restatement (Second) of Torts § 652D cmt. a (1977)) (internal quotation marks omitted). The allegations that Reynolds emailed Sheriff Joyce satisfy defamation's publication requirement.

Although the Law Court and the Restatement (Second) of Torts articulate defamation's second element as requiring an *unprivileged* publication, it is the

defendant who bears of proving "the circumstances necessary for the existence of a conditional privilege," the only type of privilege asserted by Reynolds. *Saunders v. VanPelt*, 497 A.2d 1121, 1125 (Me. 1985) (quoting Restatement (Second) of Torts § 613(2) (1976)). Maine recognizes a conditional privilege against liability for defamation in settings where "society has an interest in promoting free, but not absolutely unfettered, speech." *Cole*, 752 A.2d at 1193. "Communications made to law enforcement officials for the purpose of aiding in the detection of crime" qualify for this privilege "if made in the belief, based on reasonable grounds, that they are true." *Packard v. Cent. Me. Power Co.*, 477 A.2d 264, 268 (Me. 1984). Whether a conditional privilege exists is a question of law "based on the totality of circumstances." *Rice v. Alley*, 791 A.2d 932, 936-37 (Me. 2002). Whether a conditional privilege has been abused is a question of fact. *Morgan*, 941 A.2d at 456.

Here, the Plaintiff alleges that Reynolds developed political animosity toward Desjardins after he raised questions about land deals Reynolds had with the town. He also alleges that he was never inebriated at town meetings and drinks very little, but that Reynolds, who likely attended many of the same meetings, nonetheless claimed he was. Taken together, and considered at this stage as true, these allegations allow an inference that Reynolds filed false reports and was in a position to know that his claims were false. Accordingly, under the allegations of the Complaint, Reynolds would not qualify for the conditional privilege.

### c.   Fault Amounting at least to Negligence

The level of fault a plaintiff must prove depends on the proper application of First Amendment principles. A claimant who is a public official or a public figure, as

opposed to a private figure, must show not just negligence, but that the defendant acted with "actual malice," that is, with knowledge that the statements were false or reckless disregard to their truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (public officials); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (public figures). Individuals are deemed public officials only if they have "substantial responsibility or control over the conduct of governmental affairs," and not all government representatives qualify. *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966); *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 202 (1st Cir. 2006) (noting that "[t]he public-official classification eludes precise definition"). Individuals are deemed public figures either if they assume "roles of especial prominence in the affairs of society" (so-called "all-purpose public figures") or if they "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" (so-called "limited purpose public figures"). *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974); *Pendleton v. City of Haverhill*, 156 F.3d 57, 66-67 (1st Cir. 1998).

Further factual development is required to determine whether Desjardins is a public official or a public figure and thus must meet a higher level of fault than negligence. The Plaintiff has alleged that Reynolds had a reason to dislike him and that Reynolds was in a position to know that he was not drunk at public meetings. The allegations are sufficient to support a claim that Reynolds intentionally filed false reports to get back at the Plaintiff. Therefore, regardless of whether Desjardins

qualifies as a public official or figure, the Complaint plausibly alleges that Reynolds acted with both negligence and reckless disregard for the truth.

### d.    Per Se Damages or Special Harm

"Special harm" is "a loss of material advantages," as opposed to a mere "loss of reputation or social standing" or "emotional distress." *Withers v. Hackett*, 714 A.2d 798, 801 (Me. 1994); *see also* Restatement (Second) of Torts § 575 cmt. b (1977) ("Special harm . . . is the loss of something having economic or pecuniary value."). "Per se damages" refers to the concept that plaintiffs do not need to prove special harm under certain circumstances, such as if the defamation constitutes libel (generally, written or printed defamation) or slander per se (non-libel defamation which fits into certain enumerated categories, such as allegations that implicate one's fitness for the proper conduct of a public office). *Schelling v. Lindell*, 942 A.2d 1226, 1232 (Me. 2008); Restatement (Second) of Torts §§ 568-570, 573 (1977) (relied on by *Schelling*, 942 A.2d at 1232). Because the Complaint alleges sufficient facts to conclude that Reynolds's communications to the Sheriff's Department constitute libel and implicate Desjardins's fitness for public office, the Plaintiff does not need to allege special harm.

For the reasons stated above, the Plaintiff's allegations are sufficient on each element of defamation to withstand Reynolds's Rule 12(b)(6) Motion.

### B.    Count IV: False Light

The Plaintiff alleges that Reynolds's communications with the Sheriff's Department also give rise to liability for invasion of privacy because they placed him in a false light. According to the Law Court, an individual may be held liable for false

light if he or she (1) "gives publicity to a matter concerning another" that (2) "places the other before the public in a false light" in a way that "would be highly offensive to a reasonable person" and (3) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Cole*, 752 A.2d at 1197 (quoting Restatement (Second) of Torts § 652E (1977)).

Regarding the first element, the "publicity" requirement in a false light claim is distinct from the "publication" requirement in a defamation claim. *Id.* at 1189. "Publicity . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a (1977)). Regarding the second element, "serious offense may reasonably be expected to be taken" where there is a highly significant "misrepresentation of [the plaintiff's] character, history, activities, or beliefs." Restatement (Second) of Torts § 652E cmt. c (1977); *Nelson v. MaineTimes*, 373 A.2d 1221 (Me. 1977).

Reynolds attacks this count with the same arguments he lodged against the Plaintiff's defamation claim, which fail in this context as well. He also argues that the Plaintiff has not alleged sufficient facts to support the second element of a false light claim. The Court disagrees. Reynolds's alleged portrayal of Desjardins as an irresponsible drinker who continually endangers others on the road and disrupts public meetings adequately makes out false light's "highly offensive to a reasonable

person" requirement. Because Desjardins claims that he rarely drinks and never drives while intoxicated, the allegations involve a major misrepresentation of Desjardins's character and activities. *Nelson*, 373 A.2d 1221. It is unclear whether the Complaint sufficiently pleads the publicity element, but Reynolds does not raise the issue. For these reasons, the Plaintiff's false light claim survives Reynolds's Rule 12(b)(6) Motion.

### C.    Count VI: Section 1983

Read generously, the Plaintiff's pleadings appear to argue for § 1983 liability under two distinct theories: (1) that Desjardins was deprived of his Fourth Amendment right to be free of unreasonable seizures; and (2) that Desjardins was deprived of a liberty interest in his reputation, in violation of the Due Process Clause of the Fourteenth Amendment. Below, the Court discusses the legal landscape for the Plaintiff's claim and then addresses Reynolds's Rule 12(b)(6) arguments.

#### 1.    The Law of § 1983

Section 1983 provides an individual a cause of action against any person acting "under color of" state law who "subjects" him or "causes [him] to be subjected" to a deprivation of his federal constitutional or statutory rights. 42 U.S.C. § 1983.

As a general rule, courts "employ common law tort principles when conducting inquiries into causation under § 1983." *Drumgold v. Callahan*, 707 F.3d 28, 48 (1st Cir. 2013) (*quoting Sanchez v. Pereira-Castillo*, 590 F.3d 31, 50 (1st Cir. 2009) (internal citations and quotation marks omitted)). Causation is comprised of two distinct elements: factual causation and proximate causation. *Drumgold*, 707 F.3d at 48. Factual causation is established by showing that the injury in question would not

have occurred "but for" the defendant's actions or omissions, or that the injury was "brought about concurrently by the misconduct and an unrelated force, each of which would have been sufficient by itself to trigger the harm." *Id.* at 49. Proximate causation is present only if the defendant's actions or omissions are closely enough related to the harm that imposing liability is warranted. *Olsen v. Correiro,* 189 F.3d 52, 67-68 & nn. 16-18 (1st Cir. 1999). Establishing proximate causation requires showing, at a minimum, that the harm was "a reasonably foreseeable consequence of the misconduct." *Drumgold,* 707 F3d. at 48.

A defendant who does not directly participate in a constitutional violation may nonetheless be held liable under § 1983 if he or she "set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury." *Ocasio-Hernandez,* 640 F.3d at 16. (internal citations, quotations marks, and alterations omitted); *see also Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) (internal citations and quotation marks omitted) (defendant may be held "responsible for . . .  consequences attributable to reasonably foreseeable . . . acts of third parties," but not "unforeseen and abnormal intervention[s]").

## 2. Fourth Amendment Unreasonable Seizure Theory

### a. The Governing Law

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" by federal officers. U.S. Const. amend. IV. The Due Process Clause of the Fourteenth Amendment extends this constitutional guarantee

to searches and seizures by state officers, including local law enforcement officials. *Mapp v. Ohio*, 367 U.S. 643, 660 (1961).

A traffic stop is a "seizure" for Fourth Amendment purposes. *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984). A police officer may lawfully initiate a traffic stop if the officer has reasonable suspicion to believe that the driver has violated even a minor traffic law. *See United States v. Fernandez*, 600 F.3d 56, 59 (1st Cir. 2010) (traffic stops permissible if supported by reasonable suspicion).

> **b. Application of the Governing Law to the Allegations Against Reynolds**

The Plaintiff's Fourth Amendment claim against Reynolds seems to rely on two propositions: first, that a Sheriff's Department deputy pulled him over on January 8, 2012, on a baseless allegation of speeding; and second, that Reynolds, who was not present for the traffic stop, should nonetheless be held responsible for it. At this stage of the proceedings, the Court accepts the Plaintiff's first proposition, but the second proposition presents more trouble. The Plaintiff does not clearly articulate why Reynolds should be held responsible for the traffic stop, though a forgiving reading of his pleadings suggests the theory that Reynolds knew or reasonably should have known that his communications with Sheriff Joyce would cause others to violate the Plaintiff's Fourth Amendment rights.

To understand why this theory falls short, it is important to look closely at the sequence of events pre-dating the January 8, 2013 traffic stop, as plausibly alleged by the Complaint when read alongside the December-January emails produced by the Sheriff's Department. First, it is possible to infer that, at some point before

October of 2012, Reynolds reported to the Sheriff's Department that Desjardins drove drunk.[7] Second, on December 14, 2012, Reynolds emailed Sheriff Joyce to tell him he wanted to speak about a possible public safety issue. When the sheriff responded by asking if Reynolds's concerns were related to Desjardins, Reynolds confirmed that they were. Third, at some point between December 14, 2012 and December 21, 2012, Reynolds spoke with Sheriff Joyce by phone and told him that Desjardins had repeatedly attended town meetings drunk. Fourth, on January 7, 2013, Reynolds emailed the sheriff to ask him to have a deputy stop by the next day's selectboard meeting. Reynolds also wrote that he would call the police if he had "solid information of a public safety issue." Sheriff's Dep't Emails 9. Sheriff Joyce wrote back, declining to dispatch a deputy to the meeting but instead offering to place "a deputy out on the roadway checking for erratic operation of a motor vehicle." Sheriff's Dep't Emails 9. Sheriff Joyce explained that, unlike drunk driving, being drunk at a public meeting is not illegal. There is no allegation that Reynolds and Sheriff Joyce communicated again until after the meeting.

At most, the Complaint plausibly alleges that Reynolds encouraged the sheriff to have a deputy stop by the selectboard meeting and then assented to the sheriff's plan to have a deputy pull Desjardins over if he actually *was* driving erratically. The

---

[7]    The Court makes this inference by stitching together several fairly weak allegations. The Complaint alleges that that Desjardins learned from the December-January emails produced by the Sheriff's Department that Reynolds and Willard were the sources of the false information that led to his red-flagging before early October of 2012. Compl. ¶ 15. Sheriff Joyce's familiarity with Desjardins during the December 14, 2012 email exchange with Reynolds ("The topic doesn't involve Dana Desjardins by chance does it??") and Reynolds's alleged failure to comply with the Plaintiff's Freedom of Access request for pertinent emails allow an inference that Reynolds was one of the sources of the false information. *See* Compl. ¶¶ 19, 28; Sheriff's Dep't Emails 3.

plausible inference to draw is that Sheriff Joyce proposed a lawful stop, one either based on a violation of a traffic law or reasonable suspicion that Desjardins had been drinking. Even if Reynolds's actions set in motion a series of events that resulted in a Fourth Amendment violation, they were not its proximate cause. Under the facts as alleged, it would not have been reasonably foreseeable to Reynolds that the Sheriff's Department would pull Desjardins over when he was not driving erratically or doing anything else wrong.[8]

For the above reasons, the Complaint does not plausibly allege that Reynolds caused Desjardins to be subjected to an unreasonable seizure.

### 3. Fourteenth Amendment Stigma-plus Theory

#### a. The Governing Law

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV.

Governmental action which injures an individual's reputation may implicate a liberty interest protected by the Due Process Clause. *Wisconsin v. Constantineau*, 400

---

[8]    It is important to note that the Plaintiff has not specifically alleged that Reynolds and Sheriff Joyce entered into a civil conspiracy. The closest the Complaint gets is where it asserts that Sheriff Joyce, in his January 7, 2013 email, "suggest[ed] an agreement with Reynolds that they should catch Desjardins when he was on a public way so he could be arrested – stating that he had asked the Captain to have a deputy assigned and that they would have a deputy on the road looking for erratic operation." Compl. ¶ 26. To the extent that there was any agreement, it was to have Desjardin pulled over if there was articulable suspicion that he was intoxicated. The Court cannot draw the inference that there was a conspiracy between Reynolds and Sheriff Joyce to violate Desjardins's constitutional rights. *See Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir. 1988) ("A civil rights conspiracy is commonly defined as a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.").

U.S. 433, 437 (1971). However, a due process claim "cannot rest upon reputational harm alone." *Mead v. Independence Ass'n*, 684 F.3d 226 (1st Cir. 2012); *see also Paul v. Davis*, 424 U.S. 693, 701 (1976)). To be actionable under the Fourteenth Amendment, a reputational injury "must be accompanied by a change in the injured person's status or rights under substantive state or federal law." *Silvia v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997); *see also Constantineau*, 400 U.S. at 439 (constitutional violation where police published notice identifying plaintiff as an excessive drinker, because it caused reputational injury and made it illegal for stores to sell alcohol to the plaintiff); *Paul v. Davis*, 424 U.S. at 695-96, 712 ) (no constitutional violation where police published name and photo of plaintiff on flier labeled "active shoplifters" without notice or a hearing, because flier caused reputational injury only). This doctrine has come to be known as the "stigma-plus" standard. *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 10 (1st Cir. 2011). Under its specialized terminology, the word "stigma" refers to a reputational injury, while the word "plus" refers to a tangible legal obstacle or deprivation of rights triggered by the stigma. *Id.* at 9.

The First Circuit has held that there can be no stigma-plus liability unless the plus factor is "directly attributable to the challenged governmental action." *URI*, 631 F.3d at 10; *Mead*, 684 F.3d at 233-34; *Hawkins v. R.I. Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir. 2001). If the stigma and the plus "derive from distinct sources," the claim fails, "even if both sources are government entities." *URI*, 631 F.3d at 10.

*Hawkins* provides a helpful illustration of this principle. There, Rhode Island's governor publicly suggested that the director of the Rhode Island Lottery Commission, an independent state agency governed by its commissioners, was abusing his position. *Hawkins*, 238 F.3d at 113; Br. of Appellant-Pl. John P. Hawkins at 11-17, *Hawkins v. R.I. Lottery Comm'n*, 238 F.3d 112 (1st Cir 2001), Nos. 00-1398, 00-1660. After a flurry of negative publicity ensued, the commission fired the director, who then sued the commission and the governor under a stigma-plus theory. *Hawkins*, 238 F.3d at 113. Upholding the dismissal of the plaintiff's claims, the First Circuit noted that the governor "neither spoke for the Commission nor controlled its actions." *Id.* at 116. Liability was precluded for both defendants because "the party responsible for the alleged defamation" (the governor) "was not the party responsible for the termination" (the commission). *Id.*

**b.      Application of the Governing Law to the Allegations Against Reynolds**

Here, Reynolds's reports to Sheriff Joyce that Desjardins frequently attended public meetings drunk likely satisfy the stigma element. Read liberally, the Complaint identifies two possible plusses: (1) the "red-flagging"[10] of Desjardins; and (2) the January 8, 2013 traffic stop. Compl. ¶ 60. Both fall short.

---

[10]      The only specific allegation about what it means to be "red-flagged" by the Sheriff's Department is the following:

> a 'flag' involves a suspect who has a propensity to be assaultive on the deputies, and if there is an encounter with a red flagged person, that status requires that two officers be called to the scene.

Compl. ¶ 6.

Under the facts as alleged, it was the Sheriff's Department, not Reynolds, which "red-flagged" Desjardins, and it was the deputy, not Reynolds, who pulled him over. Just as the governor in *Hawkins* lacked the authority to fire the lottery commissioner and therefore could not be held liable for his termination, Reynolds had no authority over the Sheriff's Department and therefore cannot be held liable for red-flagging or stopping the Desjardins.

Because the Plaintiff has not stated a valid claim for relief against Reynolds under either a Fourth Amendment unreasonable seizure theory or a Fourteenth Amendment stigma-plus theory, Reynolds is entitled to dismissal of the Plaintiff's § 1983 claim and the Plaintiff's request for attorney's fees under § 1988, stated in Count VII, which depends entirely on the § 1983 claim. To the extent they depend on the § 1983 claim, the request for injunctive relief, contained in Count V, and the Plaintiff's request for punitive damages, contained in Count VIII are likewise denied.

## IV.     Willard's Rule 12(b)(6) Motion

The Complaint alleges that Willard, like Reynolds, spread false rumors that Desjardins had driven under the influence and attended public meetings inebriated. *See* Compl. ¶ 15; 28.  This general claim is based on three more specific allegations: (1) that Willard emailed Sheriff Joyce on January 5, 2013 to thank him for taking action against Desjardins, Compl. ¶ 24; (2) that Reynolds and three other selectmen later failed to respond to a Freedom of Access request for their emails, Compl. ¶ 28; and (3) that the emails produced to Desjardins by the Sheriff's Department and the failure of Reynolds and the other selectmen to respond to the Freedom of Access request reveal that Willard was one of the "sources" of the false information that led

the Sheriff's Department to red-flag Desjardins before early October of 2012. Compl. ¶¶ 11, 15, 28; Opp'n to Willard's Rule 12(b)(6) Mot. 3.

The Court begins by looking to the actual text of the January 5, 2013 email exchange, which the Complaint characterizes broadly but quotes directly only in small part. That day, at around noon, Sheriff Joyce forwarded Willard an email he had earlier sent to Deputy Goulet, in which the sheriff informed the deputy about the complaints the Sheriff's Department had received about Desjardins and instructed him to look out for Desjardins on January 8, 2013, the day of the next selectboard meeting.

Willard responded to the forwarded message that same day at about 4:30 p.m. in the afternoon:

> Thank you, Kevin, there will also be town staff in attendance to call in any observed behaviors or other signs that would indicate impairment.
>
> Have a good weekend.

Sheriff's Dep't Emails 7; Complaint ¶ 24. The series of emails produced by the Sheriff's Department reveals no further communications between Willard and Sheriff Joyce.

As an initial matter, it is clear that Willard's January 5, 2013 email cannot, on its own, support liability. The email cannot plausibly be read to confirm any factual allegations relating to Desjardins, nor to imply that Desjardins had been intoxicated in public in the past. Willard did not, for instance, write that he would have his staff call in signs that would indicate impairment *again*. Instead, the email reasonably communicates only that town staff would call the Sheriff's Department if the Plaintiff

was impaired in the *future*. The statement does not constitute a refutable assertion of fact under the law of defamation, place Desjardins in a false light that would be highly offensive to a reasonable person under the law of invasion of privacy, or inflict a reputational injury sufficient to support the stigma element of a Fourteenth Amendment stigma-plus claim.

Since this was the only exchange involving Willard in the series of emails produced by the Sheriff's Department, it also undercuts the allegation that the Sheriff's Department emails reveal that Willard was a "source" of the false information that led to the pre-October red-flagging of Desjardins. The emails themselves reveal no such thing.

Finally, the allegation that Reynolds failed to respond to a Freedom of Access Act request allows the Court to infer that Reynolds may have something to hide, *see supra* note 7 and accompanying text, but it does not support any similar conclusion with respect to Willard. The Court therefore has no basis from which to draw an inference that Willard falsely reported Desjardins to the Sheriff's Department for drinking and driving before early October of 2012.[11]

---

[11]    The Complaint references two additional groups of emails. First, the Plaintiff alleges that Willard wrote to two individuals on December 5, 2012 and suggested that he believed Desjardins had cheated Raymond's town government when he orally agreed to allow a trash container on his land but then reneged on the deal after the town made substantial improvements to his property. Compl. ¶ 17. The Plaintiff does not allege that this claim was false. Second, the Complaint alleges that there were "derogatory e-mails to Mike O'Donnell (the former Town Assessor) relating to Mr. Desjardins or his property or to the dumpster on River Road near or on Mr. Desjardins property in Raymond." Compl. ¶ 27. The Complaint does not indicate who wrote these emails. Even if the Plaintiff had alleged that both groups of emails were false and could be attributed to Willard, the Plaintiff's characterization of them—that they show Willard accusing Desjardins of cheating the town—is simply not supported by the emails themselves. Attach 4. to Willard's Rule 12(b)(6) Mot. (ECF No. 7-4); *see also Watterson*, 987 F.3d at 3.

The Court need not discuss Willard's other arguments in favor of dismissal, at least some of which appear promising. For the reasons discussed above, Willard is entitled to dismissal of all the counts against him.

## THE SPECIAL ANTI-SLAPP MOTIONS

Having analyzed both Reynolds's and Willard's Rule 12(b)(6) Motions, only the defamation and false light claims against Reynolds and the requests for injunctive relief and punitive damages that depend on them survive. The Court therefore proceeds to analyze Reynolds's Special Motion with respect to those claims only and denies the remainder of Reynolds's Special Motion and the entirety of Willard's Special Motion as moot.

## I.  The Anti-SLAPP Legal Standard

Maine's legislature intended the state's anti-SLAPP statute, 14 M.R.S. § 556, to serve as a mechanism to quickly "dispose of baseless lawsuits that are brought not to vindicate the plaintiff's rights but to punish the defendant for exercising her constitutional right to petition the government."[12] *Nader v. Me. Democratic Party*, 41 A.3d 551, 564 (Me. 2012) ("***Nader I***").

The first paragraph of the statute provides as follows:

When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of

---

[12]  Though anti-SLAPP statutes are sometimes characterized as "procedural," the First Circuit has held that federal courts deciding claims based on Maine law must abide by Maine's anti-SLAPP statute. *Godin v. Schencks*, 629 F.3d 79, 81 (1st Cir. 2010).

the United States[13] or the Constitution of Maine,[14] the moving party may bring a special motion to dismiss. . . . The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

14 M.R.S. § 556 (footnotes added).

A later paragraph clarifies the reach of the anti-SLAPP statute:

[a]s used in this section, "a party's exercise of its right of petition" means any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

*Id*. According to the Law Court, this language reflects legislative intent "to define in very broad terms those statements that are covered by the statute." *Schelling*, 942 A.2d at 1230.

---

[13]    The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition is incorporated to the states by the Fourteenth Amendment. *United Mine Workers v. Il. Bar Ass'n*, 389 U.S. 217, 222 (1967).

[14]    Article I, Section 15 of the Maine Constitution provides that "[t]he people have a right at all times in an orderly and peaceable manner to consult upon the common good, to give instructions to their representatives, and to request of either department of the government by petition or remonstrance, redress of their wrongs and grievances." Article I, Section 19 of the Maine Constitution provides that "[e]very person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay."

Interpreting the passages quoted above, the Law Court has prescribed a two-step procedure for courts to follow when applying the anti-SLAPP statute:

> At the first step, the party seeking special dismissal (the moving party) must demonstrate that the anti-SLAPP statute applies by showing that the claims against it are based on the exercise of that party's constitutional right to petition. If the moving party establishes that the anti-SLAPP statute applies, the burden shifts to the non-moving party to satisfy the second step of the procedure.

> At the second step . . . , the court must dismiss the non-moving party's claims unless the non-moving party demonstrates, through the pleadings and affidavits, that the moving party's petitioning activity does not fall within the protection of the anti-SLAPP statute. This requires prima facie evidence that at least one of the moving party's petitioning activities was devoid of any reasonable factual support or any arguable basis in law and . . . caused actual injury to the [non-moving party].

*Nader II*, 66 A.3d at 575-76 (internal citations and quotation marks omitted).

The Law Court has not yet discussed in detail what legal or evidentiary burden the moving party must meet during the first step of the analysis.[15] However, it appears simply to require the moving party to establish that the conduct at issue falls within a category that is included in the statute's laundry list of petitioning activities and is entitled to at least some protection under the First Amendment or the Maine Constitution. *See Nader II*, 66 A.3d at 576; *Nader I*, 41 A.3d at 561 n.12; *Schelling*,

---

[15] The Law Court has directly interpreted Maine's anti-SLAPP statute six times but has only applied the definition of petitioning activity three times. *See Nader I*, 41 A.3d at 561 n.12 (applying definition to allegedly baseless suits and appeals challenging Maine Secretary of State's decision to allow Ralph Nader to appear on 2004 presidential ballot); *Schelling*, 942 A.2d at 1230-31 (applying definition to allegedly false claim in a letter to the editor by a state representative defending his vote on a bill and attacking a citizen for criticizing that vote); *Maietta Constr., Inc. v. Wainwright*, 847 A.2d 1169, 1173 (Me. 2004) (applying definition to letters to mayor and city council accusing construction company of removing loam from a property in violation of company's contract with city to buy the property); *Nader II*, 66 A.3d at 576 (issue resolved by *Nader I*); *Bradbury v. City of Eastport*, 72 A.3d 512 (Me. 2013) (issue not reached); *Morse Bros., Inc. v. Webster*, 772 A.2d 842, 849 (Me. 2001) (issue not contested).

942 A.2d at 1230-31; *Maietta Constr.*, 847 A.2d at 1173. Inquiry into whether the moving party's petitioning activity was legitimate is deferred until the second step, when the non-moving party bears the burden. *See Nader II*, 66 A.3d at 576; *Nader I*, 41 A.3d at 561 n.12; *Schelling*, 942 A.2d at 1230-31; *Maietta Constr.*, 847 A.2d at 1173. For instance, in *Nader I*, the Law Court determined that unsuccessful administrative complaints filed to knock Ralph Nader off the 2004 presidential ballot were petitioning activity under the anti-SLAPP statute without first determining whether the complaints were knowingly baseless or false.[16] *Nader I*, 41 A.3d at 561 n.12.

The prima facie evidentiary standard applied in the second step of the analysis is a "preliminary burden of production" that "requires proof only of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Cookson v. State*, 17 A.3d 1208, 1211 (Me. 2011) (quoted by *Nader I*, 41 A.3d at 562). "[P]rima

---

[16]     This categorical approach makes sense as a matter of statutory interpretation. First, the text of the statute only requires the moving party to "assert" that the non-moving party's claims are based on the moving party's exercise of its constitutionally protected right to petition, whereas it requires the plaintiff to "show" that the moving party's petitioning was devoid of reasonable factual support or arguable basis in law and caused actual injury. 14 M.R.S. § 556. *Compare Black's Law Dictionary* 139 (10th ed. 2014) (defining "assert" as "[t]o state positively") *with Black's Law Dictionary* 1591 (10th ed. 2014) (defining "show" as "[t]o make (facts, etc.) apparent or clear by evidence; to prove"). Second, while baseless lawsuits and false statements are not protected by the First Amendment "for their own sake," that does not mean they are completely unprotected. *BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 528-32 (2002) ("It is at least consistent with these 'breathing space' principles that we have never held that the entire class of objectively baseless litigation may be enjoined or declared unlawful even though such suits may advance no First Amendment interests of their own.") (cited by *Nader I*, 41 A.3d at 561 n.12); *Gertz*, 418 U.S. at 341 ("The First Amendment requires that we protect some falsehood in order to protect speech that matters.").

facie proof is a low standard that does not depend on the reliability or credibility of the evidence . . . ." [17] *Id.* (same).

Regarding the "actual injury" requirement, "per se" damages—presumed damages available where a statement constitutes libel or slander per se—do not suffice. *Maietta Constr.,* 847 A.2d at 1174; *Schelling*, 942 A.2d at 1233. The requirement is met only where the plaintiff has other provable damages that are both: (1) legally compensable under Maine law, *see Schelling*, 942 A.2d at 1233; and (2) possible to determine "with reasonable certainty." *Maietta Constr.*, 847 A.2d at 1174. Where the injury alleged is purely emotional, the plaintiff must show that he suffered "serious mental distress," such that "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Schelling*, 942 A.2d at 1232 (quoting *Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433, 437 (Me. 1982)) (internal quotation marks omitted). "Emotional distress alone" does not constitute actual injury "unless it is 'so severe that no reasonable person could be expected to endure it.' "[18] *Schelling*, 942 A.2d at 1233 (quoting *Curtis v. Porter*, 784 A.2d 18, 23 (Me. 2001)).

---

[17]     Before *Nader I*, the Law Court interpreted Maine's anti-SLAPP statute to require nonmoving parties to present evidence demonstrating the absence of any genuine issue of material fact at the second step of the anti-SLAPP procedure, a more exacting evidentiary burden. *Nader I*, 41 A.3d at 560 (describing "converse summary-judgment-like standard"); *Maietta Constr.*, 847 A.2d at 1173 (announcing standard); *Morse Bros.*, 772 A.2d at 849 (applying standard). Fearing that this burden implicated constitutional concerns by preventing otherwise meritorious claims from reaching trial, the *Nader I* court re-interpreted the anti-SLAPP statute to prescribe the current prima facie standard instead. *Nader I*, 41 A.3d at 562.

[18]     The Law Court's interpretation of the statutory phrase "actual injury" does not appear to draw on *Gertz* or its progeny, First Amendment defamation cases which also employ the phrase. *Compare Gertz*, 418 U.S. at 348-49 ("actual injury"/"actual harm" includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering" and does not require evidence of the "actual dollar value [of] the injury"); Rodney A. Smolla, 2 *Law of Defamation*

## II. Anti-SLAPP Discussion

### A. Additional Anti-SLAPP Evidence

In support of his special motion to dismiss, Reynolds filed declarations from Willard, Reynolds, and three other individuals challenging the allegations in the Complaint.[19] All three of the other declarants attest to having reported Desjardins to Sheriff's Department representatives for driving or acting drunk in public before early October of 2012. White Decl. ¶¶ 4-5; Gosselin Decl. ¶ 4; Tupper Decl. ¶ 5. Willard, Reynolds and two of the three other declarants assert that Desjardins smelled of alcohol and acted out of control at a December 11, 2012 selectboard meeting. Willard Decl. ¶ 11; Reynolds Decl. ¶¶ 9-10; White Decl. ¶ 6; Tupper Decl. ¶ 4.

In response, the Plaintiff filed affidavits from Desjardins and four other individuals.[20] Desjardins and his witnesses refute the Defendants' characterizations of the December 11, 2012 selectboard meeting and portray Desjardins as an

---

§ 7:3 (2d ed. 2014) (interpreting "actual injury," as used in the *Gertz* line of cases, to mean "any form of harm, pecuniary or nonpecuniary, that is established through some form of evidence"); Restatement (Second) of Torts (1977) § 621 (using the term "actual harm" in similar sense) *with Maietta Constr.*, 847 A.2d at 1174 (defining "actual injury" in reference to damages available in contract cases); *Schelling*, 942 A.2d at 1232-33 (defining "actual injury" in reference to tort damages available in non-defamation contexts).

[19]    Sept. 20, 2013 Decl. of Michael Reynolds (ECF No. 11-1) ("**Reynolds Decl.**") (also found at ECF No. 12-7); Sept. 19, 2013 Decl. of Nathan White (ECF No. 11-4) ("**White Decl.**") (also found at ECF No. 12-4); Sept. 20, 2013 Decl. of Catherine Gosselin (ECF No. 11-5) ("**Gosselin Decl.**") (also found at ECF No. 12-5); Sept. 20, 2013 Decl. of Bruce Tupper (ECF No. 11-6) ("**Tupper Decl.**") (also found at ECF No. 12-6); Decl. of Donald Willard (ECF No. 11-7) ("**Willard Decl.**") (also found at ECF No. 12-1).

[20]    Oct. 18, 2013 Aff. of Dana Desjardins ("**Desjardins Aff.**") (ECF No. 15-1); Oct. 18, 2013 Aff. of Charles Leavitt (ECF No. 15-2) ("**C. Leavitt Aff.**"); Oct. 21 Aff. of Peter Leavitt (ECF No. 15-3) ("**P. Leavitt Aff.**"); Oct. 21, 2013 Aff. of Julie Sutherland (ECF No. 15-3) ("**Sutherland Aff.**"); Oct. 21 Aff. of John Russo (ECF No. 15-5) ("**Russo Aff.**").

upstanding citizen who never drives drunk or appears inebriated in public. Desjardins Aff. ¶¶ 3, 11, 17-18; C. Leavitt Aff. ¶¶ 5, 7, 11, 19, 22; P. Leavitt Aff. ¶¶ 5-7, 9; Sutherland Aff. ¶¶ 4-7; Russo Aff. ¶¶ 4-7. Desjardins also attests that he was injured by the Defendants' actions in three different ways: (1) because he incurred over $500 in attorney's fees in an effort to find out who was making reports about him to the Sheriff's Department; (2) because he was "humiliated and embarrassed" when a Sheriff's Department deputy pulled him over on Route 85 and half a dozen cars drove by while the deputy questioned him; and (3) because he "suffered great emotional distress" after learning in October of 2012 that the Sheriff's Department had "red-flagged" him. Desjardins Aff. ¶¶ 33-35.

### B. Applying the Anti-SLAPP Standard to the Surviving Claims Against Reynolds

#### 1. The First Step

The Complaint alleges that Reynolds defamed Desjardins and placed him in a false light on five occasions: (1) sometime before early October of 2012, *see* Compl. ¶ 15, *supra* note 8 and accompanying text; (2) on December 14, 2012, when Reynolds emailed Sheriff Joyce to tell him that he wanted to speak about a "possible public safety issue" regarding an upcoming selectboard meeting and later identified Desjardins as the source of concern, Compl. ¶ 18; (3) between December 14, 2012 and December 21, 2012, when Reynolds orally reported to Sheriff Joyce that Desjardins had appeared at earlier selectboard meetings intoxicated, Compl. ¶ 19; (4) on January 7, 2013, when Reynolds emailed Sheriff Joyce to remind him that the selectboard meeting would take place the next day and requested that a deputy be assigned to

attend, Compl. ¶ 25; and (5) on January 9, 2013, when Reynolds emailed Sheriff Joyce to tell him that Desjardins had attended two recent town meetings sober, but suggested that this was only because Desjardins had been tipped off about Reynolds's earlier complaints. Compl. ¶ 30.

Viewed together, these statements represent a continuous effort on Reynolds's part, lasting from fall of 2012 through mid-January of 2013, to focus the Sheriff's Department on a purported public safety concern caused by Desjardins and to influence how the department responded. The statements therefore fall squarely within the third category of petitioning activity delineated in Maine's anti-SLAPP statute: statements "reasonably likely to encourage consideration or review of an issue by a[n] . . . executive . . . body . . . ." 14 M.R.S. § 556. The first four statements constitute a successful attempt to get the Sheriff's Department to review an issue and take specific action. The fifth statement constitutes an attempt to encourage the Sheriff's Department to remain appropriately sensitive to an issue it had already acted on. Reynolds has therefore met his burden under the first step of the anti-SLAPP procedure.

This determination is in keeping with the decisions of courts facing similar issues. In *Lynch v. Christie*, 815 F. Supp. 2d 341 (D. Me. 2011), this District determined that submitting a police report constitutes petitioning activity under Maine's anti-SLAPP statute. *Id.* at 345 n.7. In *Wenger v. Aceto*, 883 N.E.2d 262 (Mass. 2008), the Massachusetts Supreme Judicial Court held that reporting a crime to

police constitutes petitioning activity under Massachusetts's essentially identical anti-SLAPP statute. *Id.* at 266-67; *see also* Mass. Gen. Laws ch. 266, § 37.

### 2. The Second Step

Because Reynolds has satisfied the first step of the anti-SLAPP procedure, the burden shifts to the Plaintiff. At this step, the Plaintiff is required to produce prima facie evidence that at least one of Reynolds's petitioning activities: (1) was devoid of any reasonable factual support or any arguable basis in law; and (2) caused Desjardins actual injury.

By presenting sworn affidavits which claim Desjardins has never appeared drunk at any selectboard meeting or driven under the influence, the Plaintiff has met the prima facie burden on the first of these inquiries. With respect to the second inquiry, the Plaintiff contends that each of the three separate types of harm he identified in his affidavit—attorney's fees he paid to discover who was making the allegations about him, his humiliation and embarrassment at being pulled over, and his emotional distress at learning he had been red-flagged—constitutes actual injury. Here, the Plaintiff stumbles.

Attorney's fees are not compensable under Maine law absent express statutory authorization, agreement by the parties, or certain other common law exceptions. *Goodwin v. Sch. Admin. Dist. No. 35*, 721 A.2d 642, 646 (Me. 1998); *York Ins. Grp. of Me. v. Van Hall*, 704 A.2d 366, 368 (Me. 1997); *Barber v. Inhabitants of Town of Fairfield*, 460 A.2d 1001, 1008 (Me. 1991). The Plaintiff has not pointed to any authority which would allow the Court to deviate from the American Rule which ordinarily "prohibit[s] taxing the losing party in litigation with a successful

opponent's fees." *In re Estate of Weatherbee,* No. Han-13-331, 2014 WL 2218738, at
*4 (Me. May 29, 2014). Where there is no legal basis for awarding the Plaintiff
attorney's fees, they cannot support a finding of actual injury. *See Schelling,* 942 A.2d
at 1233; *Goodwin,* 721 A.3d at 646; *York Ins. Grp.,* 704 A.3d at 368; *Barber,* 460 A.2d
at 1008.[21]

Regarding the second harm identified by the Plaintiff, the only evidence in the
record concerning the January 8, 2013 traffic stop is Desjardins's sworn affidavit. It
describes a pretextual, baseless traffic stop which at least six other drivers observed.
Desjardins Aff. ¶ 34. Even if the stop violated the Fourth Amendment, Desjardins's
affidavit suggests it ended without hostility, psychological abuse, or even a citation.
Desjardins Aff. ¶¶ 28-31. Because traffic stops are relatively routine, being
temporarily detained by the police at the side of the road carries no significant stigma.
Based on the limited evidence produced by the Plaintiff, no reasonable fact-finder
could conclude that the indignity Desjardins suffered was so severe that a reasonable
person would be "unable to adequately cope with the mental stress [it] engendered."
*Culbert,* 444 A.2d at 437; *Schelling,* 942 A.2d at 1232-33.

The third harm identified by the Plaintiff, that Desjardins suffered "great
emotional distress" after he learned he had been red-flagged, is vague and conclusory.
The Plaintiff fails even to describe the type of mental distress he suffered or what

---

[21] Even if the Court were to characterize the money paid to Plaintiff's attorney as non-legal
investigative fees that Desjardins needed to expend to clear his name, such expenses are not
compensable either. W. Page Keeton, et. al., *Prosser & Keeton on the Law of Torts* Ch. 19, § 112 & n.23
(5th ed. 1984) (that plaintiff has "been put to expense to refute" a defamatory statement is not
sufficient to establish special damage).

effect it had on him. This is insufficient to meet the bar the Law Court has set for pleading compensable mental distress under Maine law. *Culbert*, 444 A.2d at 437; *Schelling*, 942 A.2d at 1232-33.

Accordingly, the Plaintiff has failed to produce prima facie evidence of a harm that constitutes "actual injury," as the Law Court has interpreted the statutory phrase. The Plaintiff has therefore not met his burden under the second step of the anti-SLAPP procedure.

### C.    Constitutional Arguments

In addition to his merits-based arguments, the Plaintiff argues that Maine's anti-SLAPP statute unconstitutionally chills his right to petition the courts for relief, citing the Maine Constitution and Justice Silver's concurrence in *Nader I*. Pl.'s Opp'n to Def. Willard's Special Mot. to Dismiss 19-20. The open courts provision of Maine's Constitution provides, in relevant part, as follows:

> Every person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial . . . .

Me. Const. art. I, § 19.  In his concurrence to *Nader I*, Justice Silver argued that, under the *Schelling* court's interpretation of the statutory phrase "actual injury," the anti-SLAPP statute violates the Maine Constitution by imposing an insurmountable procedural bar to otherwise valid claims. *Nader I*, 41 A.3d at 565-66 (Silver, J. concurring).

The argument for the Plaintiff's position is best understood by breaking it down into three parts. First, the Legislature intended the anti-SLAPP statute to be a purely

procedural mechanism to allow courts to dispose of meritless claims more quickly. *Id.* at 564. Second, the statute as currently interpreted instead creates a *de facto* substantive change in the common law, because the anti-SLAPP procedure's "actual injury" prong can defeat meritorious claims of libel and slander per se. *Id.* at 565. The Silver concurrence cites *Schelling* as an example:

> [T]he Court required the plaintiff to prove that she had suffered compensable emotional injury in order to survive the anti-SLAPP special motion to dismiss. Had the plaintiff's cause of action for defamation been based on something other than the defendant's petitioning activity, damages would have been presumed and the plaintiff would not have been required to prove actual injury in order to survive a dispositive motion.

*Id.* (internal citations omitted). Third, while the Legislature has the power to make substantive changes to Maine's common law, the open courts provision of the Maine Constitution arguably bars the Legislature from doing so through the back door, without proper accountability, by imposing insurmountable procedural barriers to otherwise valid claims. *See id.* at 564, 567; *id.* at 561-62 (majority opinion); *Preston v. Drew*, 33 Me. 558, 560-62 (Me. 1852) (Maine legislature may constitutionally take substantive step of expressly declaring all liquor contraband and thus not "property," but, failing that, cannot take procedural step of barring owners of liquor from bringing conversion and replevin actions in Maine courts).[22]

---

[22]    Alternatively, as Justice Silver's concurrence argues, two canons of statutory interpretation advise against interpreting a law to impose an insurmountable procedural barrier: (1) that courts should construe statutes to avoid difficult constitutional issues; and (2) that a statute should only be read to abrogate the common law "if the legislative history demonstrates the Legislature's intent to do so." *Id.* at 566-67; *see also id.* at 558 (majority opinion) ("When constitutional rights are implicated in the application of a statute, [a] rule of statutory construction holds that we must construe a statute to preserve its constitutionality, or to avoid an unconstitutional application of the statute, if at all possible."); *Atlantic Oceanic Kampgrounds, Inc. v. Camden Nat'l Bank*, 473 A.2d 884, 886 (Me. 1984)

The Plaintiff's argument is an interesting one. The anti-SLAPP statute, of its own terms, does not purport to change what is actionable under common law, yet it creates a procedural bar that blocks some substantively actionable claims, such as the Plaintiff's, from ever being adjudicated on the merits. Furthermore, the open courts provision of the Maine Constitution allows specific, explicit protection for defamation-style claims based on reputational injury, and thus may provide more protection to plaintiffs in this area than the federal constitution.

Nonetheless, the Court believes it is constrained to follow the Law Court's interpretation of the statutory phrase "actual injury" as articulated by the majority of the Law Court in *Schelling*.[23] For the above reasons, Reynolds is entitled to dismissal of the defamation and false light claims against him under Maine's anti-SLAPP statute. The Plaintiff's requests for injunctive relief in Count V and for punitive damages in Count VIII are also denied.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Reynolds's Rule 12(b)(6) Motion as to Counts II, III, VI and VII, and as to Counts V and VIII to the extent they rely on the Plaintiff's § 1983 claim, but **DENIES** the remainder of Reynolds's Rule 12(b)(6) Motion; **GRANTS** Willard's Rule 12(b)(6) Motion; **GRANTS** Reynolds's Special Motion as to Counts I and IV, and as to Counts V and VIII to the extent they

---

("Although the legislature is free to abrogate a longstanding rule of common law, such an intent is not to be presumed in the absence of clear and explicit language.").

[23] *See supra* note 18 and accompanying text.

rely on the Plaintiff's state law claims, but **DENIES AS MOOT** the remainder of Reynolds's Special Motion; and **DENIES AS MOOT** Willard's Special Motion. In sum, the Court orders the Complaint to be dismissed in its entirety.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 20th day of June, 2014.